IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

Civil Case No. 5:22-cv-89

| | |
|---|---|
| 444 Inc., <br><br>　　　　Plaintiff, <br> v. <br><br> JEFFREY W. NEMYO and LAVINIA MCLEOD CRISWELL, <br><br>　　　　Defendants. | |

**COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT**

Plaintiff 444, Inc. ("444") complaining of the acts of Defendants Jeffrey W. Nemyo ("Nemyo") and Lavinia Mcloed Criswell ("Criswell") (collectively "Defendants"), files this civil action pursuant to Rule 57 of the Federal Rules of Civil Procedure and the Federal Declaratory Judgment Act, 28 U.S.C. ¶ 2201 *et seq.,* and in support of its complaint and petition for declaratory judgment respectfully shows this Court as follows:

**PARTIES, JURISDICTION, and VENUE**

1. Plaintiff 444 is a North Carolina corporation, duly incorporated and existing under the laws of the State of North Carolina with its principal place of business in Blowing Rock, Watauga County, North Carolina. 444 is a citizen of North Carolina for purposes of diversity jurisdiction.

2. Upon information and belief, Defendants Nemyo and Criswell are residents of Tampa, Florida. Defendants are over the age of 18, are not on active

military duty, and are otherwise *sui juris*. Upon information and belief, Defendants are citizens of Florida for purposes of diversity jurisdiction.

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) which confers original jurisdiction upon this Court in a civil action where, as here, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

4. This Court has personal jurisdiction over Defendants because they have continuous and systematic contact with North Carolina related to the claim at issue, *i.e.* they purchased property in North Carolina and entered into a contract for construction to be performed in North Carolina that is at issue in this Complaint.

5. This Court has the authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57.

6. The North Carolina Uniform Declaratory Judgment Act at Section 1-253 allows this court to make a legal determination of legal questions arising under a "contract" or an "instrument" that affects the "rights" or "legal relations" of the respective parties.

7. In actions seeking declaratory relief, the amount in controversy is measured by the "value of the object of the litigation", *Pres. Forest LLC v. Nationwide Gen. Ins. Co.*, No. 3:19-CV-00634-DSC, 2020 U.S. Dist. LEXIS 9494, at *3 (W.D.N.C. Jan. 21, 2020) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 347, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)). "The value of the object of the litigation is determined by 'the potential pecuniary effect that a judgment would have

on either party to the litigation.'" *Id.* (quoting *Lee v. Citimortgage, Inc.,* 739 F. Supp. 2d 940, 946 (E.D. Va. 2010). "Under this test, the jurisdictional amount is satisfied if either 'the direct pecuniary value of the right that a plaintiff seeks to enforce or the cost of the defendant's compliance with the prospective equitable relief' exceeds $ 75,000." *Id.*

8. More than $75,000 is in controversy in this case because Defendants have claimed that Plaintiff breached an agreement with Defendants and that Plaintiff owes Defendants more than $1 million in damages allegedly arising from the alleged breach of contract.

9. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged below occurred in this District.

## BACKGROUND

### Cost-plus-percentage construction contract

10. This action arises from the construction contract entered into between the parties on November 4, 2020 (the "Agreement"). *See* **Exhibit A**.

11. The Agreement is priced on a cost-plus percentage basis.

12. 444 agreed to charge Defendants (and Defendants agreed to pay) for the cost of work plus a percentage for its overhead and profit, as reflected in paragraph 5 of the Agreement in which 444 agreed to provide the Defendants with an:

> expense sheet [invoice that] will reflect a 15% mark-up
> (9% overhead & 6% profit) on all invoices and costs
> including material, services, and labor. The 15% mark-up

applies to everything that is inspected by the Building Inspector and everything that is managed by 4 Forty Four.

13. 444 also agreed to provide Defendants a budget that served as the estimate for the project.

14. 444 uses quantitative budgeting that reflects estimated units of measurement and estimated costs for known job categories, such as linear feet (lf), tons, hours, number of units, etc.

15. 444's budget for Defendants was prepared in collaboration with Defendants through an interactive process known as the "Discovery" process. A copy of the parties' Discovery Agreement is attached as **Exhibit B**.

16. In "Discovery", the parties agreed to "collectively define and document a project theme, scope of work and initial cost estimate" and, once completed, 444 agreed to "provide[ Defendants] with a site plan (showing the house location adapted to the client's property), an interior and exterior design theme with realistic finish allowances and a quantitative estimated budget as complete as the design process allows. *Id.* p 1. Defendants understood that "Discovery is a creative process, and creativity cannot be estimated precisely." *Id.*

17. 444's budget was updated and revised during the project based on instructions and changes made by Defendants.

18. A copy of 444's most recent quantitative budget ("Budget" or "Estimate") with Defendants is attached as **Exhibit C**. The Budget reflects that it is "based upon

preliminary discussions" of the plans, is only effective as of "6/2/2021", and subject to change "per material market condition." *Id.*

19. Once construction started, 444 invoiced Defendants on a cost-plus-percentage basis—*i.e.*, per the Agreement.

**Overview**

20. 444 is a residential and commercial builder located in Blowing Rock, North Carolina that holds an unlimited general contractor's license.

21. Since 2002, 444 has been a family business, owned and operated by Kevin and Lillie Troyer. In more than 20 years as cost-plus builders, 444 has had nearly an impeccable track record with its clients, having had only one litigation matter involving work performed by another builder.

22. The Troyers attribute 444s success to having built a healthy culture among their team and clients based on certain core values, such as 1) holding the best intentions towards everyone in your sphere of influence, and 2) when communicating about challenges simply tell the truth and work through the issues with humility and respect.

23. When it became clear to the Troyers that continuing to work with Nemyo was potentially dangerous for 444 team members (*i.e.* once team members became unsafe working Nemyo), 444 determined that it must separate from the Defendants.

24. On September 29, 2020, 444 met with Defendants at their property to inform them that 444 could not continue with the project because Mr. Nemyo had

mistreated and physically threatened member's of 444's construction team who had concerns for their safety.

25. 444 also planned to inform Defendants that, according to a survey it had recently received, two deck footers had been poured within a few feet of a twelve-foot building setback. These footers were to support a large deck off one side of the house. 444 discovered this condition before it began building the deck.

26. 444 did not decide to terminate the relationship because of the setback issue. In fact, the setback issue complicated the termination. Nonetheless, Mr. Nemyo's erratic and aggressive behavior had been escalating over the previous weeks, and 444 had no choice—Nemyo's, behavior prohibited 444 from continuing to work with Defendants.

27. Upon hearing that 444 could not continue to work with Defendants because of Nemyo's behavior, Nemyo terminated the Agreement abruptly by yelling at representatives of 444—as was his custom—that he was done with 444 and that Nemyo was going to his lawyers.

**Nemyo's Behavior**

28. The parties' relationship began in 2019 when Defendants sought 444 as a builder for their vacation home. The project was delayed until 2021 due to septic permitting issues – issues that 444 patiently and diligently worked through with Defendants – and a change in design scope for the garage. In 2019, Mr. Nemyo had been pleasant and easy to work with.

29. By August 2021, however, soon after 444 had begun pouring the footings and started on the foundation for the main house, Mr. Nemyo began complaining about delays, even though 444 had made considerable progress in short time.

30. At a September 1, 2021 meeting, Mr. Nemyo insulted 444's Project Manager and 444, and compared their work to "tract houses." Mr. Nemyo accused 444 of sloppy work, even though the work was performed properly and had already passed inspection. Mr. Nemyo also questioned the integrity of 444 and threatened to hire a third-party inspector to oversee the entire project.[1]

31. Mr. Nemyo threatened a lawsuit against 444 over the quality of the foundation block work and claimed that 444 could go out of business over the lawsuit.

32. All this within the first five weeks into construction.

33. 444 paused the foundation work the following day and scheduled a follow-up meeting with Defendants for September 7, 2021, to discuss whether the parties should move forward or separate from the project.

34. In the meantime, 444's team, including the Troyers, Mr. Spencer, Mr. Critcher, Ms. Cook, and Senior Project Manager Ross Napier and COO Interior Design Services, Emily Anderson, met to discuss whether to separate from the project. They had an extended discussion about Mr. Nemyo's rudeness, temper, and threatening behavior to that point.

---

[1] Mr. Nemyo threatened to hire a 3rd party inspector, and then confirmed to 444 that he did hire a 3rd party inspector, who subsequently inspected the block work and found it to be good workmanship.

35. Although agreeing to move forward, 444's team agreed to monitor Mr. Nemyo and report any threatening or unsafe behavior.

36. In the September 7 follow-up meeting with the Defendants, Mr. Spencer cautioned Defendants that Mr. Nemyo would need to improve his communication and demeanor towards 444's staff if 444 was going to move forward.

37. Although Mr. Nemyo said he would improve, he didn't. Mr. Nemyo continued to exhibit disrespectful and offensive behavior.

38. He continued to make comments about "getting his lawyer involved" and "firing" 444 while dismissing 444's attempts to reassure him of 444's commitment to the project, stating that his "BS detector was through the roof"; claiming his house was an "afterthought" to 444 and demanding that 444's crews work 7 days a week from sun up to sun down, and lay more than 100 blocks each day.

39. Mr. Nemyo further ranted about the indignity of having a mere 11K cabinet package when he expected the highest-end cabinets 444 could find.[2] Likewise, he unfairly criticized 444 for including pressure treated wood decking in the Budget when he expected "exotic hardwoods." While saying such things, Mr. Nemyo simultaneously insisted that 444 lower the Estimate for the project.

40. Beyond his issues with the finishes, Mr. Nemyo continued to malign 444's integrity and threatened to compare 444's foundation costs to data from the

---

[2] Nemyo refused to acknowledge that many of the finishes 444 suggested were based on the finishes in the purchased plans. For example, the plans called for a shower/tub insert in one of the bathrooms and when this was one of the options in the selection process, Nemyo was offended and called it a "tract home" offering.

Capua Law Firm, PA
8
Case 5:22-cv-00089-KDB-DCK   Document 1   Filed 07/04/22   Page 8 of 17

national average of foundation costs to see if he'd been overcharged and claimed he was documenting everything. According to Mr. Nemyo, there would be "problems" if he wasn't satisfied.

41. By this time, most of 444's team were recommending that it was in everyone's best interest (including the Defendants) to separate from the project.

42. Even so, on September 14, 2021, Mr. Napier, in collaboration with Mr. Spencer and the others, agreed to give the Defendants one last chance.

43. Mr. Nemyo's behavior did not improve. In fact, it got much worse.

44. In a September 24 meeting to discuss finish selections with Ms. Cook and Mr. Spencer, Mr. Nemyo was uncooperative and, according to Ms. Cook, "belligerent" towards her.

45. At the same time that Mr. Nemyo was resistant to engaging in the selections process, that he considered to be premature, he berated Ms. Cook and continued to ask for "high end" finishes while insisting 444 reduce its Budget.

**Confrontation in Blowing Rock**

46. On September 27, 2021, Mr. Nemyo came to 444's offices without notice or an appointment looking for Mr. Spencer.

47. 444's receptionist, Amanda Waters, told Mr. Nemyo that Mr. Spencer was not at the office.

48. Mr. Nemyo then asked to speak to Mr. Troyer, Lillie Troyer, or Mr. Critcher.

49. Ms. Waters tried calling each of them but they did not answer. Ms. Waters said Mr. Nemyo appeared "visibly irate" and made comments to her about how no one was at his job site working that she found unprofessional.

50. After leaving 444's office, Mr. Nemyo tracked Mr. Spencer down at the parking lot of a restaurant that was a client of 444's.

51. Mr. Nemyo walked up to Mr. Spencer and 444 journeyman David Ivester in the parking lot, in view of the public and restaurant personnel.

52. Mr. Nemyo confronted Mr. Spencer angrily, put his finger in Mr. Spencer's face, and proceeded to rant and criticize Mr. Spencer and all of 444's staff for not being at his job site and for not responding to his wife, Ms. Criswell's, email - sent only three hours prior to the confrontation.

53. Mr. Spencer and Mr. Ivester found Mr. Nemyo's conduct to be aggressive, unpredictable, and potentially dangerous.

54. Following that confrontation, 444 decided it was time to separate. An idea that Mr. Nemyo had articulated on more than one occasion, having communicated his desire to "fire" 444.

55. At this point, however, Mr. Spencer was still investigating and exploring solutions for the setback encroachment that 444 discovered a few days earlier. The timing of Mr. Nemyo's confrontation coupled with the setback issue had complicated 444's decision to separate. Notwithstanding 444's plan to separate from the project, it intended to resolve the setback issue and work with Mr. Nemyo on a plan for redesigning the deck.

## Termination Day

56. 444 scheduled the September 29, 2021 meeting to discuss the separation on-site, so that 444 could show Defendants the boundary lines and guide them through the setback issue and offer options for solutions.

57. Within minutes of starting the meeting, Mr. Nemyo grew agitated and asked Mr. Napier whether 444 could commit to completing the framing by January 2022. As Mr. Napier began to explain that 444 could not complete the project due to Mr. Nemyo's conduct, Mr. Nemyo cut him off and said, "I've got a meeting with the attorneys—it's all over!", flew off the handle, and then stormed off, ignoring Mr. Napier's requests to take a calmer approach and discuss a workable solution. Mr. Nemyo then jumped in his truck and sped off leaving his wife, Ms. Criswell, behind, who apologized for her husband's behavior.

58. The following day (September 30), Mr. Spencer notified the Defendants via email of 444's decision to terminate the contract and other things, as Ms. Criswell requested. A copy of the termination notice is attached hereto as **Exhibit D** and provides in part:

> On four separate occasions, we have been communicated to by Jeff with threats, insults, and an unwillingness to be considerate of others and their perspectives. This kind of communication has been exhibited to our Project Management team, our Interior Design team, our office support staff, and our field staff and the general public when we were approached on the premises of another project of ours… We simply cannot allow you to address us in that manner any longer, and we will not subject our team to that kind of treatment.

59. At the conclusion of the project, Defendants owed approximately $37,000 in invoices that have not been paid. See, **Exhibit E**.

**The Setback Issue Discovered - an Easily Remediable Condition.**

60. The setback issue, identified just days before the termination, was an easily remediable condition.

61. On September 24, 2021, in preparation for submitting 444's first construction draw to Defendants' construction lender, 444 requested New River Land Surveying (NRLS) to prepare an as-built re-combination survey.

62. The results were different from what 444 and the Defendants were expecting because it was the Defendants who had instructed 444 of the location of their boundary line and both parties understood that the boundary line was in a location well outside the bounds of the setback.

63. After seeing the survey, 444 repeatedly stated and maintained that it is willing to help resolve the issue, even before conducting its own investigation in the survey's accuracy.

64. Mr. Spencer began working on proposed solutions to present to the Defendants, which they did. Even to this day—and notwithstanding that the survey is potentially inaccurate—444 is prepared to work with the Defendants to resolve the issue.

65. Initially, Ms. Criswell agreed to one of the solutions proposed by Mr. Napier, which was to remove the footings and shorten the deck.

66. Defendants later changed their minds and refused 444's proposed solutions.

67. On June 16, 2022—nine months after offering to fix the issue—Defendants sent a demand to Plaintiffs seeking over $1 Million dollars to have the project completed by another contractor. Defendants demand is baseless for a number of reasons including that 1) Defendants' are not entitled to post-termination completion costs on a cost-plus-percentage contract; and 2) the contractor that Defendants presumably have hired to finish the project proposed the *same* solution 444 presented to the Defendants over nine months ago---that is, removing the footers and shortening the deck---at a cost of only $750.00.

68. Since then, 444 has learned that their remains ambiguity over whether the survey showing the setback violation accurately reflects the true boundary lines for the property.

69. All conditions precedent and dispute resolutions provisions under the Agreement have been satisfied or waived. Although the Agreement provides for mediation and arbitration procedures as the means for resolving their disputes, the parties have expressly waived those requirements in writing.

## COUNT I – BREACH OF CONTRACT

70. The allegations of the foregoing paragraphs are incorporated herein by reference.

71. The Agreement is a valid contract subject to the laws of North Carolina.

72. Defendants breached the Agreement by: (1) failing to pay invoices as required; (2) obstructing 444's performance under the Agreement by disrespectful, aggressive, and threatening behavior; (3) obstructing 444's performance by refusing the participate in the Discovery process – *i.e.* failing to provide timely direction concerning the scope of the work to be performed; and (4) acting in bad faith when 444 raised the setback issues.

73. Under the factual circumstances of this case, Defendants breached their duty of good faith and fair dealing. Defendants mistreated Plaintiff and its agents in such a way that injured the right of Plaintiff to receive the benefits of the Agreement and deprived the Plaintiff of the fruits of its bargain. Defendants' behavior also thwarted and obstructed 444's ability to perform its obligations under the Agreement.

74. As a result of Defendant's actions, Plaintiff has been harmed in amounts to be fully determined at trial on the merits.

## **COUNT II – DECLARATORY JUDGMENT**

75. The allegations of the foregoing paragraphs are incorporated herein by reference.

76. This declaratory judgment action is brought pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 & 2202 to declare the rights and obligations of the parties arising from a contract for construction of a private residence.

77. As set forth above, 444 would show that actual controversies exist between it and Defendants regarding the parties' respective rights and obligations

under the Agreement. This genuine controversy would be terminated by the granting of declaratory judgment.

78. As alleged in the paragraphs above, 444 believes and therefore avers that it had cause to terminate the Agreement based on Defendants' breach.

79. Accordingly 444 seeks a judgment declaring that 444 had cause to terminate the Agreement.

80. Additionally, after notifying Defendants of termination, Defendants have stated that they intend to sue 444, not solely for the cost to remedy the setback violation and any diminution in value from having a shorter deck, but for their full cost-to-complete damages in having another contractor complete the project.

81. Defendants are asserting that Plaintiff breached the Agreement by "abandoning" the project and claiming all the post-termination costs to complete the project using another contractor.

82. Defendants claim their cost-to-complete damages exceed $1 Million dollars, and are basing that claim on two estimates received from their new contractor. Such estimates are attached as **Exhibit F**. Defendants are making such assertions notwithstanding that the new estimates show that Defendants intend to remove the footers and shorten the deck—as 444 recommended—at a cost of only $750.00.

83. Making matters worse, Defendants have filed complaints against 444 and its qualifiers with the North Carolina Licensing Board that omitted the facts

about Nemyo's dangerous behavior and falsely claiming that Defendants abandoned the Defendants' project – another first for 444.

84. 444 believes and therefore avers that the Agreement is a cost-plus contract—not a fixed price—and cost-to-complete damages are not recoverable for an alleged breach of such a contract, just as 444 would not be entitled to sue Defendants for is anticipated lost profits on unperformed work.

85. Accordingly 444 seeks a judgment declaring that 1) 444 did not breach the Agreement when it informed Defendants it could not continue with the project for safety reasons; 2) that 444 did not abandon the project when it terminated the Agreement; and 3) cost-to-complete damages are not recoverable from a breach of a cost-plus-percentage construction agreement.

86. Finally, 444 believes and therefore avers that there is no actual setback violation and, as such, seeks a judgment declaring that there is no actual setback violation.

## ATTORNEYS' FEES

Plaintiff seeks to recover reasonable attorneys' fees incurred in conjunction with this action pursuant to the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the court to grant it the following relief:

1. Enter a judgment in favor of Plaintiff against Defendants under U.S.C. § 2201 declaring that:

    a. 444 had cause to terminate the Agreement;

Capua Law Firm, PA
16

b. 444 did not "abandon" the Defendants' project;

c. Cost to complete damages exceeding $1 million are not recoverable from breach of a cost-plus-percentage construction agreement;

d. There is no setback violation based on the current placement of the deck footers; and

e. Defendants are entitled to no relief against 444.

2. Enter a judgment in favor of Plaintiff and against Defendants on their claims of breach of contract and breach of the covenant of good faith and fair dealing;

3. Award reasonable attorneys' fees to Plaintiff pursuant to N.C.G.S. 6-21.2 and the attorney's fees provision in the Agreement;

4. Tax costs and fees against Defendants under applicable law;

5. Trial by jury as to all issues; and

6. For such other and further relief and the Court deems just and proper.

Respectfully submitted this the 4th day of July, 2022.

**s/Paul A. Capua**
Paul A. Capua / N.C. State Bar No. 40239
Genevieve A. Mente/ N. C. State Bar No. 41887
*Attorneys for Plaintiff*
CAPUA LAW FIRM, PA
164 South Depot Street
Boone, NC 28607
Telephone: (828) 264-0260
Fax: (828) 378-0236
E-mail: paul@capualaw.com
E-mail: mente@capualaw.com
